Brian S. King, #4610
**Brian S. King, Attorney at Law**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorney for Plaintiffs

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| ANN T., | : | |
| | : | |
| Plaintiff, | : | COMPLAINT |
| | : | |
| vs. | : | |
| | : | Civil No.  2:13-CV-00867 DS |
| THEDACARE INC., THE THEDACARE INC. | : | |
| GROUP BENEFIT PLAN and UMR, INC., | : | |
| | : | |
| | : | |
| Defendants. | : | |

Ann T. ("Ann"), individually and through her undersigned counsel, complains and alleges against Defendants Thedacare Inc., the ThedaCare Inc. Group Benefit Plan ("the Plan"), and UMR, Inc. ("UMR") as follows:

### PARTIES, JURISDICTION AND VENUE

1. Ann is a natural person residing in Shawano County, State of Wisconsin.

2. Thedacare Inc. is a foreign corporation with its corporate headquarters located in the State of Wisconsin.  Thedacare Inc. is the employer of Ann's husband and sponsor and

administrator of the Plan, which provides healthcare benefits for Thedacare Inc.'s employees and their dependents.

3. The Plan is a self-funded employee welfare benefit plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA").

4. The Plan includes benefits for mental health coverage and Ann was covered by the Plan at the time the treatment at issue in this case was rendered.

5. UMR is a domestic corporation with its corporate headquarters in the State of Utah. UMR does business across the United States and is the third party administrator of health claims for the Plan.

6. Ann received medical care and treatment in Seymour, Tennessee, at Brookhaven Retreat ("Brookhaven"), a residential treatment facility that mental health care for women.

7. The Plan and UMR denied Ann's claims for coverage for her treatment at Brookhaven. This lawsuit is brought to obtain this Court's order requiring the Plan to pay for Ann's unpaid treatment at Brookhaven.

8. This Court has jurisdiction of this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) because UMR does business and operates an office in Salt Lake City, Utah, and Plaintiff's chosen counsel resides in Utah. Based on ERISA's nationwide service of process provision and 28 U.S.C. § 1391, venue is appropriate in the State of Utah.

10. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due and pursuant to 29 U.S.C. § 1132(a)(1)(B), an award of prejudgment interest and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## FACTUAL BACKGROUND
### Ann's Developmental and Medical Background

11. Ann is married and she and her husband have three children.

12. Ann has struggled with chronic depression throughout her adult life.

13. When Ann gave birth to her third child in 2008, she experienced a sharp decline in her depression that did not improve. Ann experienced elevated stress and anxiety along with severe depression that included suicidal thoughts and attempts.

14. In an attempt to mitigate her symptoms, Ann attended weekly outpatient therapy along with receiving pharmacological treatment from Dr. Paul C. Burney, MD. Dr. Burney treated Ann during the years leading up to her treatment at Brookhaven.

15. However, Ann's depressive symptoms did not improve. Dr. Burney observed that Ann's depression was treatment-resistant.

16. In addition to outpatient treatment, Ann required inpatient psychiatric hospitalization on two separate occasions; both for suicidal ideation.

17. The first hospitalization was on November 5, 2009. Ann was admitted to Bellin Health Psychiatric Center ("Bellin") in Wisconsin with a diagnosis of "major depression severe recurrent without psychotic features." Ann also has a history of migraine headaches. Ann admitted to suicidal ideation with a plan and the ability to carry out the plan.

18. While at Bellin, Ann admitted to severe depressive symptoms such as worthlessness, hopelessness, low energy, poor concentration, chronic fatigue, and recurrent early morning awakening.

19. Ann was discharged from Bellin on November 11, 2009, with cessation of her suicidal thoughts and some improvement in her depressive symptoms.  However, the prognosis was guarded because of her chronic treatment resistant symptoms.

20. Ann continued outpatient treatment with Dr. Burney with fluctuations in her level of depression but with no resolution.

21. On September 19, 2010, Ann was admitted to Bellin for the second time. Borderline personality disorder was added to Ann's diagnoses and at the time of admission, Ann's GAF was 20[1].

22. Initially, Ann refused any sort of treatment such as medication, electroconvulsive therapy, and counseling.  Ann denied authorization for Bellin to communicate with her family and she had no contact with her husband or children for several days after her admission.  Ann refused to get out of bed and refused to make eye contact with hospital staff.

23. After several days, Ann allowed Bellin to contact her family and agreed to begin a course of medication in an attempt to address her depression symptoms.

24. While at Bellin, Ann was sent to the emergency room for chest pain related to possible coronary artery vasospasm.

25. The treatment Ann received during her second stay at Bellin included medication for her depression, anxiety, and occasional difficulties with reality testing/thought, along with individual psychotherapy focused on helping her better understand her dysfunctional intra- and interpersonal dynamics and precipitating life circumstances.

---

[1] The global assessment of functioning ("GAF") was developed as a tool for mental healthcare providers to assess the overall level of functioning and ability to carry out activities of daily living for their patients. A GAF of 11-20 in an adult indicates "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death, frequently violent, manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."

26. The prognosis on discharge was extremely guarded with a prediction for future hospitalizations, suicide attempts and possibly completed suicide.

27. On October 1, 2010, Ann was discharged from Bellin with a GAF of 50.[2]

28. Dr. Burney reported that Ann was not helpful at coming up with a plan for treating her own depressive symptoms post-discharge, and that she continued to rely on other people rather than take control of her own life and circumstances to come up with a plan to find personal self-fulfillment and satisfaction.

29. After leaving Bellin, Ann went to Texas where she stayed with her parents for two weeks.

30. During Ann's hospitalization and later, while she was in Texas, she saw very little of her husband and children. Ann eventually moved back to Wisconsin but in light of the strained relationship between Ann and her husband, she was living in the basement of the family home.

31. Dr. Burney stressed that he could no longer treat Ann on an outpatient level because it was an ineffective method of treatment for her condition. He stated: "I think there is a strong chance that [Ann] will have further hospitalizations, suicide attempts, or gestures and potentially even completed suicide if she feels that it will hurt her spouse."

32. Furthermore, Dr. Burney expressed that the treatment her condition required wasn't available anywhere near where she lived. He recommended Brookhaven for the specialized treatment it offered:

> Ideally I believe that Ann would be best served in treatment via a dialectical behavioral therapy model to address the Axis II issues. Therapists that engage in this sort of treatment typically meet patients multiple times per week for multiple

---

[2] A GAF of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning(e.g., no friends, unable to keep a job)."

years. Unfortunately counselors who specialize in dialectical behavioral treatment simply do not exist in the Green Bay area and/or do not provide the level of service that is required for optimum treatment response via this counseling method. My second option would be long-term group therapy for similar reasons, and there are no group therapy options for patients with borderline personality disorder or related issues in the Green Bay area. The closest treatment option in this area is a day treatment program in Appleton, but that is a program that typically only sees people for a few weeks at a time. Given the treatment resistant nature of Ann's depression, and the fact that personality disorders typically take years to treat, not weeks to treat, even that option is far from optimum. I believe an extended residential stay at a reputable treatment facility, such as Brookhaven, is definitely a reasonable treatment option for Ann to pursue given the lack of treatment opportunities available in the Green Bay and due to the life-threatening nature of her mental illness to date.

33. On the recommendation of Dr. Burney, Ann was admitted to Brookhaven on December 5, 2010.

34. Ann received treatment at Brookhaven from December 5, 2010 through March 24, 2011.

35. While at Brookhaven, Ann received psychotherapy, individual and family therapy, weekly psychiatric consultations for medication management, medical evaluations and nutritional counseling. She also participated in groups to increase her understanding of mental health, body image, and relationship issues in order to develop a better understanding of her behaviors and healthy coping skills to deal with life stressors.

36. Ann completed a self-assessment on a daily basis, rating her anxiety, depression, irritability and self-esteem on a scale of one to ten, along with stating her physical, mental, emotional, and spiritual state.  During the entirety of her treatment, Ann did have some days when she reported feeling better.  However, over two-thirds of her self-assessments indicated anxiety and depression at 5 or higher.

37. Throughout the course of her treatment, Ann was frequently on either constant observation or 15 minute checks to ensure her safety.

38. During the course of her therapy at Brookhaven, Ann revealed a past trauma which she had never admitted or discussed with anyone before. She told her therapist that she thought the trauma was closely related to her depression, anxiety and anger.

39. On March 24, 2011, Ann was transferred from Brookhaven to Peninsula Hospital on an involuntary commitment order in light of her frequent expressions of suicidal ideation over the prior week. The commitment order indicated that Ann needed inpatient treatment where her safety could be more adequately ensured.

40. Ann's GAF at discharge was 15. Her mental status was reported as: recent suicidal ideations, I/J impaired, mood depressed, affect angry and depressed.

41. Ultimately, Ann's condition required treatment at a *higher* level of care than the residential treatment provided at Brookhaven.

42. Dr. Burney sent a letter requesting preauthorization of Ann's admission and treatment at Brookhaven on December 2, 2010.

43. In a letter dated December 16, 2010, the Plan denied coverage on the basis that the care was not medically necessary and stated: "[a]fter an outside review of your wife's case it was determined that the requested services could have been provided on an outpatient basis." A second basis for denial provided in the letter was that Brookhaven was a "self pay only facility and will not bill on a proper claim form, therefore reimbursement is not possible."

44. Ann appealed the denial on June 7, 2011. Ann's appeal included a letter from Dr. Burney in which he summarized Ann's treatment history.

45. Ann also included copies of relevant portions of the Plan including a provision instructing patients on how to submit claims themselves when they received care from healthcare providers who do not bill insurers.

46. Other documents and information provided by Ann with her appeal included a copy of Brookhaven's license to do business in the State of Tennessee and copies of medical records prepared during her treatment at Brookhaven.

47. On July 22, 2011, Quantum upheld the denial of coverage for residential treatment at Brookhaven, despite Ann's documented history of suicide attempts and chronic depression. In the denial letter, Quantum claimed that: "the residential stay does not qualify as a covered benefit according to the ThedaCare Plan language. To meet criteria for inpatient services under the ThedaCare Plan a person has to be suicidal, homicidal, psychotic or dysfunctional to the point where without residential treatment their condition would deteriorate."

48. Ann appealed again on September 13, 2011. Ann argued in her letter that her condition met the criteria relied on by the Plan. Ann also complained of the review process utilized by the Plan. She noted that the identity and credentials of the reviewing physician had not been provided as required and there was no reference in the denial to specific medical information supporting the Plan's position.

49. Ann included with her letter copies of relevant Plan provisions, medical records from her inpatient admissions at Bellin, therapy notes from Dr. Burney, and medical records from Brookhaven.

50. Quantum sent another denial letter on October 20, 2011, which maintained that Ann's documented history of chronic depression, borderline personality disorder and ongoing suicidal ideation did not meet the Plan's criteria for residential treatment.

51. Ann has exhausted the pre-litigation appeal process as required under the terms of the Plan.

## CAUSE OF ACTION
### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

52. ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan fiduciary such as UMR, namely that a fiduciary "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

53. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1133(2).

54. The Plan and UMR breached their fiduciary duties to Ann when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in Ann's interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of Ann's claims. In addition, the Plan and UMR's reliance on criteria for acute inpatient mental health care, which is not the level of care Ann was receiving, is a violation of 29 U.S.C. §1133(2).

55. The actions of the Plan and UMR in failing to provide coverage for Ann's medically necessary residential treatment at Brookhaven are a violation of the terms of the Plan and UMR's criteria.

56. The actions of the Plan and UMR, as outlined above, have caused damage to Ann in the form of denial of payment for medical services rendered to Ann totaling approximately $128,333.62.

57. The Plan and UMR are responsible to pay Ann's medical expenses as benefits due under the terms of the Plan together with prejudgment interest pursuant to U.C.A. §15-1-1, attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the amount of $128,333.62, the total unpaid amount that is owed for Ann's treatment at Brookhaven, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 23rd day of September, 2013.

By    s/ Brian S. King
      Brian S. King
      Attorney for Plaintiffs

Plaintiff's Address:

Shawano County, Wisconsin.